KLESTADT & WINTERS, LLP
Sean C. Southard
Fred Stevens
Brendan M. Scott
570 Seventh Avenue, 17th Floor
New York, New York 10018
(212) 972-3000

*Proposed Attorneys for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MICHAEL MAZZEO ELECTRIC CORPORATION., | : | Case No. 11-14888 (MG) |
| Debtor. | : | |

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MICHAEL MAZZEO DATACOM INC., | : | Case No. 11-14889 (MG) |
| Debtor. | : | |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION AND (III) SCHEDULING A FINAL HEARING

Michael Mazzeo Electric Corporation ("MMEC") and Michael Mazzeo Datacom, Inc., ("MMD", and together with MMEC, the "Debtors") each as a debtor and debtor in possession in the above-captioned chapter 11 cases by their proposed attorneys, Klestadt & Winters, LLP, hereby file this motion (the "Motion") seeking entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Cash Collateral Order"), and a final order (the "Final Cash Collateral Order," together with the Interim Cash Collateral Order, the "Cash Collateral Orders") (a)

authorizing the Debtor to use Cash Collateral (as defined herein) pursuant to sections 361 and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); (b) approving the form of adequate protection provided to the Signature Bank, pursuant to Bankruptcy Code sections 361, 362, 363 and 364; (c) scheduling a final hearing ("Final Hearing") on the Motion; and (d) granting related relief. In support of this Motion, the Debtor respectfully represents as follows:

**Jurisdiction and Venue**

1. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein is sections 363(c)(2) of the Bankruptcy Code and Federal Bankruptcy Rules 4001(b), (d) and 9014 and Local Rule 4001-2.

**Background**

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the Affidavit of David Parker Pursuant to Rule 1007-2 of the Local Bankruptcy Rules (the "Parker Affidavit"), and is incorporated herein by reference.[1]

4. The Debtors continue in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.  No trustee or committee has been appointed in these cases.

## The Debtors' Business Operations

A.  MMEC's Business Operations.

6.  MMEC was founded in 1977 by Michael Mazzeo, Jr. The company was incorporated in the State of New York in 1980 and over the past 30 years grew to be one of the largest electrical contractors in the metropolitan New York and surrounding areas.

7.  As a long standing contractor with the International Brotherhood of Electrical Workers ("IBEW") and signatory to both IBEW Local Number 3 (NYC) ("Local 3") and 25 (Long Island) ("Local 25"), MMEC's core business is the installation of electrical power, lighting, and low voltage systems for large commercial, institutional and industrial customers.

8.  MMEC's projects range from minor service/maintenance work that can be completed in a matter of hours to complex multi-million dollar projects that span several years. MMEC was Verizon's Disaster Recovery Contractor and, after the September 11, 2001 terrorist attacks, MMEC responded and mobilized a work force of 150 electricians to Verizon's headquarters at 140 West Street in Manhattan. The building, located at "Ground Zero" was severely damaged by the events of September 11th. MMEC successfully repaired the building's electrical services and over the next three years performed approximately $70 million in services at that site. Each year MMEC provides the work associated with the Tribute in Light and September 11 commemoration services.

9.  MMEC's forte is the installation of emergency generators and power distribution systems. MMEC successfully installed hundreds of generators throughout New York City and

---
[1] Capitalized terms shall have the meanings ascribed to them in the Parker Affidavit unless otherwise defined herein.

3

Long Island for customers including Verizon, Pfizer, Mount Sinai Hospital, Elmhurst Hospital, Harlem Hospital, Lutheran Medical Center, Verizon Business and Sage Realty.

10. In addition, MMEC has a long history of successfully completing projects for many of the area's largest Hospital/Health Care facilities including Mount Sinai, Memorial Sloan Kettering, Weil Cornell, Beth Israel, NYU Medical and St Luke's – Roosevelt.

11. MMEC also has a division that excels in interior fit-out work. Many large scale projects were performed in this sector over the last few years for customers including Tishman Interiors, Structuretone, Turner Corp, and Skanska. The work included all electrical and low voltage systems for office space, lobbies and common space.

12. MMEC's annual revenues steadily grew from $23 million in 2000 to over $58 million in 2008. At its peak, MMEC employed over two hundred electricians and thirty office personnel.

B.   MMD's Business Operations.

13. MMD was incorporated in July of 2006 in the State of New York. The company was formed to deliver excellence and expertise to the growing needs of the telecommunications market. James Vinci Sr. was a veteran of over 30 years in the telecom cabling infrastructure industry when he approached 3 of the owners of Michael Mazzeo Electric Corp. to form a new entity. The idea was to form a Tel-Data installation and service company that would take advantage of the opportunities that often go hand in hand with electrical construction. The initial business model assumed that MMD could grow annual revenues to $25 million per year by the third year of operation. The main industry that MMD targeted and serviced was the financial

sector, including Barclays Capital, Lehman Brothers, JP Morgan Chase, Deutsche Bank, FINRA and Bear Sterns.

14. Over the past five years, MMD successfully completed many Tel-Data projects for the clients listed above as well as others including a $7,000,000 project for Turner Construction Company (CM) and the NYS Department of Health (Owner) in Queens, NY.

15. As of October 14, 2011, MMD employed approximately ten IBEW electricians and one project manager.

16. MMD is currently providing Tel-Data work on three MMEC projects.

## The Cash Collateral

17. Prior to the Petition Date, pursuant to the terms, conditions and limitations set forth in the documents identified in paragraph 8 below, Lender extended to MMEC various credit facilities, including a $4,000,000 secured line of credit (the "MMEC LOC Facility"), a $2,312,500 secured loan (the "MMEC Note Facility") and an Advised Letter of Credit in the maximum amount of $1,500,000 (the "Advised LOC Note"). As of October 1, 2011, Lender asserted that MMEC owed Lender a balance of $3,960,323.39, inclusive of interest, on account of the MMEC LOC Facility, $376,025.74, inclusive of interest, on account of the Note Facility, and $1,203,136.22, inclusive of interest, on account of the Advised LOC Note.

18. In addition, MMEC and MMD agreed to guaranty certain obligations owed by Chriker Realty, LLC ("Chriker") to Lender under a certain Amended Credit Grid Promissory Note in the original principal amount of $2,500,000.00 (the "Grid Note Facility", and together with the MMEC LOC Facility, the Advised LOC Note and the MMEC Note Facility, the "Secured Prepetition Obligations"), delivered to Signature by Chriker dated September 26, 2009.

As of October 1, 2011, Lender asserted that MMEC and MMD owed Lender a balance of $2,517,500, inclusive of interest, on account of the Grid Note Facility as a result of these guarantees.

19. The Secured Prepetition Obligations are evidenced by certain documents, including, (i) a certain Promissory Note in the original principal amount of $4,000,000 (the "LOC Note") delivered to Signature by MMEC dated as of August 2, 2010; (ii) a certain Line Letter Renewal ("Line Letter Renewal"), among Signature, MMEC, Chriker Realty, LLC, Michael Mazzeo and David Parker, dated as of March 2, 2009; (iii) a certain Term Note in the original principal amount of $2,312,500 between Signature and MMEC, dated as of March 2, 2009, (the "Term Note"); (iv) the Advised LOC Note, (v) the Grid Note; (vi) certain Reaffirmation of Guaranties of Payment of MMEC and MMD, each dated as of September 26, 2009 (vii) a certain Amended Credit Grid Promissory Note in the original principal amount of $2,500,000.00; (viii) a certain Continuing Guaranty of MMD, dated as of March 4, 2009; (ix) a certain Continuing General Security Agreement, between MMEC and Lender, dated as of May 29, 2002; (x) a certain Forbearance Agreement, between MMEC, MMD, Chriker, Michael Mazzeo, David J. Parker, Michael A. Joyce, James Vinci, Sr. as obligors and Lender; and (xi) a Pledge Agreement between MMEC and the Lender dated December 8, 2010; and (xii) properly filed UCC-1 financing statements (collectively, as amended, supplemented or otherwise modified prior to the Petition Date, the "Loan Documents"). A copy of the Loan Documents are annexed hereto as **Exhibit B**.

20. To secure their respective Secured Prepetition Obligations to Lender, MMEC and MDD granted to Lender, for the ratable benefit of Lender, security interests in, and liens on (the

"Prepetition Liens") all of their personal property and fixtures, in each case whether then or thereinafter existing or then owned or thereafter acquired and whether subject to the Uniform Commercial Code including, but not limited to, all goods, money, contract rights, instruments, accounts, farm products, inventory, equipment, documents, chattel paper, securities and general intangibles and all interest, dividends and other distributions paid and payable in cash or in property (including those arising out of MMEC's interest in MD Constructors, LLC); and all replacements and substitutions for, and all accessions and additions to, and all products and proceeds of all of the foregoing (the "MMEC and MMD Prepetition Collateral").

21. In addition, on or about December 14, 2010, MMEC entered into a forbearance agreement with Lender, whereby Lender agreed to forbear from enforcing its rights and remedies triggered by alleged defaults by MMEC under certain of the terms of the Loan Documents. In exchange for Lender's agreement to forbear from enforcing its rights, among other things, MMEC pledged to Lender the entirety of its fifty percent (50%) ownership interest in a certain joint venture entity known as MD Constructors, LLC (the "MD JV"), and granted to Lender a security interest in all cash collections made by MMEC from MD JV (the "MD JV Prepetition Collateral", and together with the MMEC and MMD Prepetition Collateral, the "Prepetition Collateral").

22. All cash in the Debtors' possession or control as of the Petition Date and all cash coming into the Debtors' possession after the Petition Date constituting proceeds of the Prepetition Collateral is cash collateral of Lender within the meaning of Section 363(a) of the Bankruptcy Code (the "Cash Collateral").

23. In addition to the foregoing, the Internal Revenue Service (the "IRS") has filed four tax liens against MMEC. The first lien, in the amount of $926,497.07, was filed on May 25, 2010, related to allegedly unpaid federal taxes. The second lien in the amount of $712, was filed on July 16, 2010. The third lien in the amount of $1,079,022, was filed on September 7, 2010. The fourth lien in the amount of $2,836.69, was filed on October 15, 2010.

24. The IRS has also filed three tax liens against MMD. The first lien, in the amount of $741,061.45, was filed on December 21, 2010, related to allegedly unpaid federal taxes. The second lien in the amount of $182.251.52, was filed on January 24, 2011. The third lien in the amount of $345,459.54, was filed on May 25, 2011.

25. As of the Petition Date, the Local 3 had provided notice to its members that due to nonpayment by the Debtors, health benefits would not be provided to members that continued to work on the Debtor's projects. As a result of this notice, the Debtor's men were not on the projects as of the Petition Date.

**Relief Requested**

26. The Debtors respectfully request that the Court (i) enter the Interim Cash Collateral Order which is styled as a proposed Stipulation and Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(C) and Granting of Adequate Protection Pursuant to 11 U.S.C. § 361 in the form attached hereto as **Exhibit A** authorizing the interim use of Cash Collateral on the terms and conditions set forth in the Interim Cash Collateral Order, and scheduling a Final Hearing on the Motion; (ii) at the Final Hearing, enter an order authorizing the continued use of Cash Collateral on the terms and conditions set forth in the proposed order to be

filed by the Debtors with the Court; and (iii) grant such other and further relief as is just and proper.

## Summary of Interim Cash Collateral Order

27. The Interim Cash Collateral Order provides, among other things, that the Debtors shall be entitled to use the Cash Collateral in accordance with and subject to the terms and conditions set forth therein. Generally, the proposed use of Cash Collateral shall be consistent with and for the purposes described in the budgets attached to the Interim Cash Collateral Order as *Exhibits A and B* (the "Budgets"), prepared by the Debtors and delivered to Lender, or as otherwise approved by Lender. Other key provisions of the Interim Cash Collateral Order are set forth below.

A. <u>Adequate Protection</u>

28. As adequate protection for any diminution in the value of the Prepetition Collateral resulting from (i) the use of the Cash Collateral pursuant to Bankruptcy Code § 363(e), (ii) the use, sale or lease of the Prepetition Collateral (other than the Cash Collateral) pursuant to Bankruptcy Code § 363(c) and (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), the Interim Cash Collateral Order provides that Lender shall be granted (upon Court approval and effective as of the Petition Date and without the necessity of the execution by the Debtor of any other security agreement or pledge agreement), pursuant to Bankruptcy Code §§ 361 and 363(e), to the same extent, priority and validity as the Prepetition Liens, Pledge and Guaranty existing with respect to the Prepetition Collateral as of the Petition Date, valid and perfected, replacement security interests in, and liens on ("<u>Replacement Liens</u>"), all of the Debtor's right, title and interest in and to all of the Debtor's existing and after-acquired tangible

and intangible personal property in existence on or acquired or created at any time after the Filing Date, including, without limitation the Postpetition Collateral (the "Postpetition Collateral"), junior only to the Carve-Out (as defined below).

29. The Interim Cash Collateral Order also provides for payment to the Lender on the first of each month the interest only due the Lender. The Budgets estimate this amount to be equal to $30,000 on a monthly basis.

B. Carve-Out

30. Pursuant to paragraph 9 of the Interim Cash Collateral Order, Lender expressly agrees that the Prepetition Liens and any Replacement Liens shall be subject to a carve-out (the "Carve-Out") for (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest pursuant section 3717 of title 31 of the United States Code, (ii) the costs and administrative expenses not to exceed $15,000 in the aggregate that are permitted to be incurred by any chapter 7 trustee pursuant to an order of this Court following any conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, and (iii) the payment of allowed professional fees and disbursements (the "Professional Fees and Disbursements") incurred by the professionals retained by the Debtors equal to any accrued and unpaid Professional Fees and Disbursements arising prior to November 18, 2011 not to exceed $50,000 (the "Interim Professional Carve-Out Cap"); provided that to the extent any professionals retained by the Debtors are paid on account of fees under the Budgets before November 18, 2011, any such payment amounts shall reduce dollar-for-dollar the amount available under the Interim Professional Carve-Out Cap.

C.    Event of Default

31.    As long as any portion of the Prepetition Obligations remains unpaid, it shall constitute an event of default under the Interim Cash Collateral Order (each a "Stipulation Event of Default") if the Debtor fails to comply with any of the material terms or conditions of the Interim Cash Collateral Order.

32.    Such Debtor shall have the right to cure a Default within ten (10) days of the occurrence of such Default (the "Cure Period"). If such Default has not been cured before the expiration of the Cure Period, then Lender may exercise its rights and remedies and take all or any of the following actions against the defaulting Debtor without further modification of the automatic stay pursuant to Bankruptcy Code § 362 (which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to the Court: (a) terminate the use of Cash Collateral; (b) declare the principal of and accrued interest, fees and other liabilities constituting the Secured Prepetition Obligations to be due and payable; and (c) exercise any other right or remedy permitted under the Loan Documents, the Interim Cash Collateral Order, any applicable court order or by operation of law against any remaining Postpetition Collateral (including any remaining Cash Collateral); provided, however, Lender may take the actions described in clause 11(a) through (c) above only after the seventh (7th) day (the "Termination Date") following the date of receipt by counsel to the defaulting Debtor(s), the United States Trustee and any statutory committee(s) appointed in the Cases (or if no committee is appointed the top twenty unsecured

creditors in each case), of prior written notice of Lender's intent to take such actions, provided that no order prohibiting such actions is entered by the Court on or prior to the Termination Date.

D. Time Limitation on Lien Challenge

33. The terms of the Interim Cash Collateral Order shall be binding upon all parties in interest, including, without limitation, the Debtors and any statutory committee appointed in the these cases, provided however, that any statutory committee appointed in these cases may investigate and if it deems appropriate, commence an adversary proceeding pursuant to Bankruptcy Rule 7001 or contested matter as required by the Bankruptcy Code and Bankruptcy Rules (an "Adversary Proceeding") challenging the amount, validity, enforceability, perfection or priority of the Secured Prepetition Obligations or the Prepetition Liens on or related to the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against Lender on behalf of the respective Debtor's estates, no later than the date that is the later of (i) 60 days from the entry of an order approving the Interim Cash Collateral Order or (ii) 60 days after the date of the initial appointment of the statutory committee of unsecured creditors, and (b) a final non-appealable order is entered in favor of the plaintiff in any such timely filed Adversary Proceeding that has been determined by the Court to have been properly filed under the Bankruptcy Code and the Bankruptcy Rules. In the event no statutory committee is appointed in the Debtors' cases, any creditor of the Debtors' estates shall have the right to challenge Lenders' claims subject to the time limitations set forth in this paragraph.

34. Despite the initiation of any such Adversary Proceeding, the Prepetition Obligations and the Prepetition Liens on or related to the Prepetition Collateral shall be presumed valid and entitled to the benefit of the terms of the Stipulation pending the entry of a final non-

appealable judgment and order otherwise modifying Lenders rights with respect to the Prepetition Obligations and the Prepetition Liens, Pledges and Guaranty on or related to the Prepetition Collateral. If no such Adversary Proceeding is timely commenced as provided in the foregoing paragraph, (i) the Prepetition Obligations shall constitute allowed claims, not subject to subordination and otherwise unavoidable, for all purposes in the Case and any subsequent chapter 7 case, (ii) the Prepetition Liens, Pledges and Guaranty on or related to the Prepetition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, claim, counterclaim, re-characterization, offset of any kind, subordination, and otherwise unavoidable, and (iii) Lender, the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estate against Lender shall be forever waived and released.

E.  Extraordinary Provisions

35. This Court's Guidelines for Financial Requests (the "Guidelines"), which were adopted by General Order No. M-274, dated as of September 9, 2002, require the Debtors to conspicuously disclose any Extraordinary Provisions (as defined in the Guidelines) to be approved by the Interim Cash Collateral Order. The Debtors believe that the proposed Interim Cash Collateral Order does not include any Extraordinary Provisions.

36. It should be noted that the Interim Cash Collateral Order sets forth that the Lender is agreeing to forego a request for post-petition liens on Avoidance Actions and/or a waiver of the Debtors' rights under Section 506(c) of the Bankruptcy Code for this interim Interim Cash Collateral Order only. The Interim Cash Collateral Order expressly reserves the Lender's rights to seek a lien upon Avoidance Actions and/or secure a waiver of the Debtors' rights under

Section 506(c) of the Bankruptcy Code as a condition to use of Cash Collateral in connection with any future order entered in connection with these Cases. To the extent this reservation of rights is deemed to be an Extraordinary Provision, the Debtors hereby disclose the same.

F.     Union Accord

37.    As of the Petition Date, the Local 3 had provided notice to its members that due to nonpayment by the Debtors during the prepetition period, health benefits would no longer be provided to any members of the Local 3 that continued to work on the Debtor's projects. As a result of this notice, the Debtors' men were not engaged on the Debtors' projects as of the Petition Date.

38.    Fortunately, after lengthy negotiations on the Petition Date, the Debtors were able to reach a tentative agreement that should allow the Debtor's workers to return to the projects immediately upon the assurance to Local 3 that it will receive certain funds allocated to health benefits for the Local 3. In accordance with the Budgets annexed hereto, the Local 3 will receive an amount equal to two-week's worth of benefits to be held as a deposit and only drawn upon in the event of a default in payment of post-petition benefits due by the Debtors. Subject to agreement on final language to be inserted into the Interim Cash Collateral Order, the Debtors believe that the Lender and Local 3 have reached a consensus that will allow the Debtors to operate in chapter 11.

**Basis for Relief**

39.    Pursuant to court order, a debtor in possession may be authorized to use cash collateral in the ordinary course of its business operations under Bankruptcy Code §§ 363(c) and 1107. The Court may condition such use, pursuant to Bankruptcy Code § 363(e), as is necessary

to provide adequate protection of any interest held therein by any entity other than the debtor in possession.

40. Courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); see also In re Dynaco, 162 B.R. 389, 396; In re Stein, 19 B.R. 458 (Bania. E.D. Pa. 1982). Bankruptcy Rule 4001 (b) governs authorization for utilizing cash collateral and provides that the court may permit the debtor-in-possession to use cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable harm. After a final hearing held on at least fifteen days' notice, the court may grant the authority to use cash collateral on a permanent basis and other permanent relief requested herein.

41. Courts determine the means for providing adequate protection on a case-by-case basis. See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). Adequate protection is provided to protect a secured creditor from any diminution in the value of its interest in the particular collateral during the period of use. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. at 736; In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

15

42. Pursuant to Section 363(c) of the Bankruptcy Code, the Debtors request authorization to use Cash Collateral during the period from the Petition Date through November 18, 2011, subject to further court-approved extensions of such period (the "Specified Period") to pay those actual, necessary ordinary course operating expenses set forth in the Budgets. In exchange for the use of Cash Collateral the Debtors propose to grant the Lender adequate protection in the form of Replacement Liens on the Postpetition Collateral and cash payments of interest on a monthly basis in the amount of $30,000.

43. The use of the Cash Collateral is essential to the Debtors' rehabilitation efforts. The Debtors require the ability to pay expenses to preserve the going concern value of their operations. Authorization to utilize Cash Collateral will provide the Debtors with the liquidity necessary to operate their businesses and pay the various expenses associated therewith. Without authorization to utilize the Cash Collateral, the Debtors' business operations will be severely interrupted, if not completely terminated, and serious and irreparable harm to the Debtors and their estates would occur.

44. The Debtors have no access to cash other than the proceeds derived from their business operations.

45. As set forth in the Interim Cash Collateral Order, Lender, has consented to the Debtors' use of Cash Collateral under the terms and conditions set forth in the Interim Cash Collateral Order and the Budgets attached thereto.

46. In order to avoid immediate and irreparable harm, pending the Final Hearing, the Debtors respectfully asks the Court to allow the Debtors to use the Cash Collateral on an

emergency basis, pursuant to the terms and conditions of the Interim Cash Collateral Order, to make payments of necessary ordinary-course expenses, as identified in Budgets.

47. At the Final Hearing, the Debtors will seek authority from the Court to use Cash Collateral through the Specified Period for the payment of ordinary course expenses in accordance with the Budgets. If the Debtors anticipate a need to use additional Cash Collateral beyond the Specified Period, the Debtors may seek a further order of this Court.

48. Based on the foregoing, it is respectfully submitted, that this Court should authorize the Debtors' use of Cash Collateral on an emergency basis and, after a Final Hearing, for the remainder of the Specified Period.

### Notice of Final Hearing

49. Notice of this Motion and proposed Emergency Cash Collateral Order will be provided by email, facsimile or overnight delivery of a copy to (a) the Debtors' pre-petition lender, by its counsel, (c) the twenty (20) largest unsecured creditors of the Debtors; (d) all known creditors who have or assert liens against the Debtors' assets; (e) the Internal Revenue Service; (f) The New York State Department of Taxation and Finance (g) the United States Attorney's Office for the Southern District of New York; (h) the Office of the United States Trustee; and (i) all parties filing a notice of appearance in this case (the "Notice Parties"). Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that it be authorized to serve notice of the Final Hearing and a proposed Final Cash Collateral Order upon the Notice Parties, on or before a date to be set by the Court, and upon counsel to any official committee appointed herein, within one day after the Debtors receive notice of the appointment of such counsel. In

light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

## No Prior Request

50. No previous request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court enter an order granting the relief requested herein, and such other and further relief as may be just.

Dated: New York, New York
October 21, 2011

        Respectfully submitted,

        KLESTADT & WINTERS, LLP
        *Proposed Attorneys to Debtors and Debtors in Possession*

        By: /s/Sean C. Southard
            Sean C. Southard
            Fred Stevens
            Brendan M. Scott
        570 Seventh Avenue, 17th Floor
        New York, New York 10018
        T: (212) 972-3000
        F: (212) 972-2245